## PACIFIC EXPRESS CO. v. ROSS.

(Court of Civil Appeals of Texas. Galveston. Jan. 25, 1913.)

1. CARRIERS (§ 158*)—CONTRACTS BETWEEN SHIPPER AND CARRIER—CONSIGNEES.

In an action against a carrier for injury to goods, the consignee is bound by a valid contract of carriage made between the shipper and the carrier as to the value of the goods.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 663–667, 699–703½, 708–710, 718, 718½; Dec. Dig. § 158.*]

2. CARRIERS (§ 158*)—CONTRACTS LIMITING LIABILITY OF CARRIERS FOR NEGLIGENCE.

A provision in a bill of lading that the carrier should not be held liable beyond the sum of $50, "unless the just and true value thereof is stated herein, and an extra charge is agreed to be paid therefor, based upon such higher value," is not void as an attempt to arbitrarily limit liability for loss from negligence, without regard to real value.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 663–667, 699–703½, 708–710, 718, 718½; Dec. Dig. § 158.*]

---

*For other cases see same topic and section NUMBER in Dec. Dig. & Am. Dig. Key-No. Series & Rep'r Indexes

**3. CARRIERS (§ 155*)—PUBLISHED RATES—NOTICE.**

A shipper, being required to take notice of published rates filed with and approved by the Interstate Commerce Commission, and which the carrier is required to charge, is bound by a provision in a bill of lading providing that, if the shipper does not state the value of a shipment in the bill of lading, the carrier will not be liable for more than $50, although he was ignorant of its presence; such being, in effect, a declaration that the goods were not worth more than $50.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 677, 679, 682–685, 691–696; Dec. Dig. § 155.*]

Appeal from Harris County Court; C. C. Wren, Judge.

Action by J. O. Ross against the Pacific Express Company. Judgment for plaintiff, and defendant appeals. Reformed and rendered.

James L. Minnis, of St. Louis, Mo., and Wilson & Dabney, of Houston, for appellant. Baker, Botts, Parker & Garwood and J. C. Townes, Jr., all of Houston, for appellee.

REESE, J. J. O. Ross sued the Pacific Express Company in the justice court for $122.20, the value of a box of automobile parts which had been shipped from Detroit, Mich., by the Everett-Metzger-Flanders Company to J. O. Ross at Houston, Tex., by the Pacific Express Company, and which it was alleged had been lost by the negligence of the express company. The plaintiff had judgment in the justice court for the amount claimed, from which judgment the defendant prosecuted an appeal to the county court, where a like judgment was rendered. From this last judgment, this appeal is prosecuted. The following conclusions of fact, found by the trial court, are adopted by us:

"(1) On April 14, 1909, the Everett-Metzger-Flanders Company, at Detroit, Mich., shipped to J. O. Ross, to Houston, Tex., one box of automobile parts. There is no evidence that this box was marked or otherwise indicated as to its contents to the knowledge of the express company, or that the express company knew the value of the shipment. The statement of the bill of lading is merely that one box was shipped. This bill of lading was made out by the shipper and signed and receipted for by the express company's driver, Wilson, as is customary, at the time when this box was delivered to the express company, and invoice made out by the Everett-Metzger-Flanders Company, the shipper, for $122.20, the invoice price of the goods, and a copy of the invoice was sent, with the shipment, to Ross, the plaintiff. In this invoice, the various articles are itemized. Mr. Ross had paid for the goods in advance.

"(2) The Everett-Metzger-Flanders Company, the shipper, had been furnished by the express company with a book of blank bills of lading, as is usual in case of large shippers, so that the bills of lading may be filled out by the shipper and signed by the driver when he calls for the various packages. As stated above, the bill of lading covering these articles had been so filled out, covering not only this shipment, but shipments to various other points. The invoice was not mentioned or delivered to the driver, merely the box of articles and bill of lading already made out, which he signed. Among other provisions in this bill of lading was the following contained in section 5 thereof: 'Nor in any event shall this company be held liable or responsible, nor shall any claim be made upon it, beyond the sum of fifty dollars unless the just and true value thereof is stated herein, and an extra charge is paid or agreed to be paid therefor, based upon such higher value.' This shipment was filled out by the shipper on the bill of lading as follows: 'Date, 4/14/09. Article, one box. Value, ———. Consignee, J. O. Ross. Destination, Houston, Texas. Receipted by Wilson.' The whole was completely filled out, except the signature of the driver, Wilson, before it was tendered to him by the shipper.

"(3) The shipping clerk of the Everett-Metzger-Flanders Company, one S. R. Shaw, who packed and shipped the goods involved in this controversy, knew that the receipt book containing blank bills of lading had been furnished by the express company to his concern, but did not know the contents or provisions of the bills of lading, and had never looked up to see whether any tariffs had been filed by the express company. It was not a part of his duty to check any rates, and he was not familiar with the different rates charged for different weights, nor the contents or provisions of the forms of bills of lading furnished by the express company. Frank Shaw, the manager of the Everett-Metzger-Flanders Company, was fully informed as to the stipulation in the bills of lading as set out in section 5 quoted above. It was his duty to check rates on outbound prepaid shipments and on inbound shipments. He had no direct personal connection with the shipment in controversy. It was the custom of the express company to ask occasional shippers for the valuation of the goods shipped; but it was not their custom to ask regular and large shippers. The Everett-Metzger-Flanders Company was a regular and large shipper through the said express company. As stated above, the Everett-Metzger-Flanders Company filled out bills of lading on the blank forms furnished them, ready for the driver, and did not fill up the valuation blank except when it prepaid the freight on outbound shipments or sent C. O. D. shipments.

"(4) At the time this shipment was made, there was in force the Interstate Commerce Commission rates, which from Detroit, Mich., to Houston, Tex., on articles of this character, was $6 per 100 pounds, and the weight

*For other cases see same topic and section NUMBER in Dec. Dig. & Am. Dig. Key-No. Series & Rep'r Indexes

of this box was 215 pounds, making the rate of $12.90, without regard to the valuation charge; but there was also in force the official express classification and table of graduated charges issued April 10, 1908, in which it was provided as follows, among other things: 'Valuation charges on merchandise. (a) Merchandise rates are based upon a value of not exceeding $50 per shipment, and no further liability is assumed by the express company unless the shipper declares at time of shipment a higher value. When such declared value exceeds $50, the following additional charges must be made on the value in excess of $50, viz.: When a value higher than that declared is shown by an invoice accompanying the shipment, the higher value must be charged on. (d) When merchandise rate exceeds $3, and not more than $8 per 100 pounds, 15 cents for each $100 value or fraction thereof.' The rate charged by the express company was $12.90. The invoice value not having been declared upon, the valuation charge has not been made; but, under the valuation charge, the rate would be $13.05 instead of $12.90. The Interstate Commerce Commission rates and graduated charges No. 18 were filed with the Interstate Commerce Commission and promulgated by it, and were in force at the time this shipment was made and governed it.

"(5) The articles shipped had no market value in Houston, Tex., at the time they should have reached Houston; but the real and actual value thereof in Houston, when they should have reached Houston, was $122.-20, with the freight charge added. The articles shipped were partly lost; and those that reached Houston were in a practically worthless condition, and therefore are found to have been completely destroyed or lost.

"(6) It was not shown how the articles were lost and damaged."

We supplement these findings as follows: The invoice referred to did not accompany the shipment, and appellant had no knowledge of its contents, nor of the contents of the box, or their value. Upon these facts the trial court found, as a conclusion of law, that neither Everett-Metzger-Flanders Company, nor any of its servants or agents, had any authority to bind J. O. Ross by its or their failure to declare the real value of the articles.

[1] The very foundation of the action is that the goods were delivered by the company to the appellant for transportation and delivery to Ross at Houston, and that this act of delivery was for Ross' use and benefit. This delivery involved the execution of a shipping contract, showing the terms under which appellant undertook the carriage and delivery of the goods. To carry out the idea expressed by the court's conclusion of law to its logical consequences, if the shipper, the Everett Company in this case, had expressly represented to the appellant that

the goods were of the value of $50, and expressly agreed that this was their value, and that the freight was to be charged accordingly, such agreement would not have been binding upon Ross. If Ross was not bound by the implied agreement arising out of the failure to state a higher value, that the goods were not of a higher value than $50, then clearly he would not have been bound by the express contract of the shipper, made in order to secure a reduced rate of freight, that the goods were not of a higher value than $50. We think it clear that the conclusion of the trial court is erroneous. The shippers were Ross' agents in delivering the goods to appellant for transportation and in taking the receipt, which embodied the shipper's contract; and that Ross is bound by the terms of the shipping contract to the same extent he would have been if he had in person made the shipment, we do not think can be denied.

[2] This brings us to the main question in the case. It is contended by appellee that the stipulation in the shipping contract set out in the findings of fact is void on the ground that it is an attempt, on the part of the carrier, to limit its liability for loss occasioned by its negligence by fixing, arbitrarily and without regard to its real value, the value of the property accepted for transportation. We may premise that no question is made that the property was lost by the negligence of appellant.

The case is ruled by the terms of the act of Congress regulating interstate commerce. Adams Express Co. v. Croninger, 226 U. S. 491, 32 Sup. Ct. 148, 57 L. Ed. ——, decided by the Supreme Court of the United States January 6, 1913. This act, known as the Carmack amendment, is as follows: "That any common carrier, railroad or transportation company receiving property for transportation from a point in one state to a point in another state shall issue a receipt or bill of lading therefor and shall be liable to the lawful holder thereof for any loss, damage or injury to such property caused by it or by any common carrier, railroad, or transportation company to which such property may be delivered, or over whose line or lines such property may pass, and no contract, receipt, rule or regulation shall exempt such common carrier, railroad, or transportation company from the liability hereby imposed: Provided, that nothing in this section shall deprive any holder of such receipt or bill of lading of any remedy or right of action which he has under existing law. That the common carrier, railroad or transportation company issuing such receipt or bill of lading shall be entitled to recover from the common carrier, railroad or transportation company on whose line the loss, damage or injury shall have been sustained, the amount of such loss, damage or injury, as it may be required to pay to the owners of such prop-

erty, as may be evidenced by any receipt, judgment or transcript thereof."

Upon this point, the Supreme Court in the cited case says: "That the legislation supersedes all the regulations and policies of a particular state upon the same subject results from its general character. It embraces the subject of the liability of the carrier under a bill of lading which he must issue, and limits his power to exempt himself by rule, regulation, or contract. Almost every detail of the subject is covered so completely that there can be no rational doubt but that Congress intended to take possession of the subject and supersede all state regulation with reference to it. Only the silence of Congress authorized the exercise of the police power of the state upon the subject of such contracts. But when Congress acted in such a way as to manifest a purpose to exercise its conceded authority, the regulating power of the state ceased to exist. Northern Pacific Ry. v. State of Washington, 222 U. S. 370 [32 Sup. Ct. 160, 56 L. Ed. 237]; Southern Railway v. Reid, 222 U. S. 424 [32 Sup. Ct. 140, 56 L. Ed. 257]; Mondou v. Railroad, 223 U. S. 1 [32 Sup. Ct. 169, 56 L. Ed. 327, 38 L. R. A. (N. S.) 44]; Michigan Central Railroad v. Vreeland [227 U. S. 59, 33 Sup. Ct. 192, 57 L. Ed. ——], just decided."

Both parties in their briefs cite and rely upon the report of Commissioner Lane of the Interstate Commerce Commission "In the Matter of Released Rates," reported in 13 Interst. Com. R. 550 et seq. While this does not purport to be a decision of any court, it treats of the whole subject here involved so exhaustively with such fullness of original argument, and supported by such wealth of authority bearing directly on the question here involved, that it is as valuable as the decision of the highest court would be. The question under discussion was the construction of section 20 of the Interstate Commerce Act, being the Carmack amendment (Act June 29, 1906, c. 3591, § 7, 34 Stat. 593 [U. S. Comp. St. Supp. 1911, p. 1307]) heretofore set out. Following an exhaustive review of the authorities, both state and federal, the report deduces therefrom certain conclusions which cover every phase of the question. The following only of such conclusions need be referred to here: "3. If a rate is conditioned upon the shipper's agreeing that the carrier's liability shall not exceed a certain specified value. * * * (b) The stipulation is valid, even when loss is due to the carrier's negligence, if the shipper himself has declared the value, expressly or by implication; the carrier accepting the same in good faith as the real value, and the rate of freight being fixed in accordance therewith. (c) The stipulation is void as against loss due to the carrier's negligence or other misconduct if the specified amount does not purport to be an agreed valuation, but has been fixed arbitrarily by the carrier without reference to the real value. (d) The stipulation is void as against loss due to the carrier's negligence or other misconduct if the specified amount, while purporting to be an agreed valuation, is in fact purely fictitious and represents an attempt to limit the carrier's liability to an arbitrary amount." These conclusions, we think, are sound and well supported by authority.

In which category does the present case fall? This can best be determined by a process of elimination. Was the stipulation in the shipping contract purely fictitious, and does it represent an attempt to limit the carrier's liability to an arbitrary amount? We think clearly not. The stipulation in the shipping contract herein set out, as to a value not exceeding $50, had absolutely no effect, and was not, on its face, intended to have any effect, if the shipper declared that the goods were of a greater value. Nor was it purely fictitious. The substance of it was that, as the carrier, in order to be able to fix the rate to be charged, had to have some fixed value placed on the property, this amount was to be considered as such fixed value, unless the shipper declared otherwise. Having no means of ascertaining the value which was known to the shipper, the articles being boxed up, the stipulation was not, in legal effect, that, regardless of the value, the shipper would not be liable for more than $50, but in effect an agreement, as we will show later, that the real value, known to the shipper, and not known to the carrier, was not more than $50. Surely if the shipper impliedly or expressly agrees with the carrier, or represents to the carrier, that property offered for transportation is of a certain value, for the purpose of getting the benefit of a lower rate, the carrier being ignorant of the true value, there is no principle of law nor rule of public policy that forbids that recovery, in case of loss by negligence, be limited to such value, if in fact less than the real value. It would be otherwise if the carrier knew that the goods were, in fact, worth largely more than that so represented by the shipper. 1 Hutchinson on Carriers, § 427; Hart v. Penn. R. R. Co., 112 U. S. 331, 5 Sup. Ct. 151, 28 L. Ed. 717; 6 Cyc. 401; Alair v. N. P. Ry. Co., 53 Minn. 160, 54 N. W. 1072, 19 L. R. A. 764, 39 Am. St. Rep. 588; Ga. R. R. & Bkg. Co. v. Keener, 93 Ga. 808, 21 S. E. 287, 44 Am. St. Rep. 197; Graves v. L. S. & M. S. R. R., 137 Mass. 33, 50 Am. Rep. 282; Harvey v. Terre Haute & Indianapolis R. R. Co., 74 Mo. 538. The stipulation referred to does not fall within subdivision "d" of the commissioner's report.

What we have said, we think, supports equally the conclusion that the stipulation referred to does not fall within subdivision "c" of the commissioner's conclusion. The value has not been fixed arbitrarily by the carrier, without regard to its real value. In fact, it has not been fixed by the carrier at all.

If it has been fixed at all, it has been by the act of the shipper in failing, with full knowledge of the terms of the shipping contract and of the ignorance on the part of the carrier of the true value, to declare its true value. If, therefore, the stipulation in the shipping contract falls under either of the subdivisions of the commissioner's conclusions quoted, it must be under subdivision "b," and we think it does.

It does not matter that the receipt was not signed by the shipper. It was made out by its agent by filling in the blank in one of the shipping receipts, a book of which was left by the appellant with it to be used for that purpose; the agent of appellant signing the receipt thus prepared by the shipper, on one of its blank forms, when the property was delivered. The filling out of this receipt, and delivery of the property to the carrier upon the signing of the same by its agent, was an acceptance of all of the terms of the contract that were valid in law. Nor is it material that the servant of the Everett-Metzger-Flanders Company, who filled out the receipt and delivered the goods, testifies that he was not acquainted with the terms and stipulations of the receipt. The traffic manager had full knowledge on this point; and the ignorance of the person who was appointed to fill out the receipt, to have it signed by the carrier's agent, and to deliver the property to him, cannot excuse the shipper nor the appellee, whose agent he was. There was no imposition by the carrier. Every opportunity possible was afforded the shipper to acquaint himself with the terms of the receipt; and the carrier had a perfect right to assume that he had done so, and that he accepted all the valid terms of the contract. In view of this, can it be said that the shipper "has himself declared the value expressly or by implication"? We do not see how there can be a doubt upon this question. The stipulation in the receipt, "nor in any event shall this company be held liable or responsible, nor shall any claim be made upon it beyond the sum of $50, unless the just and true value thereof is stated herein and an extra charge is paid or agreed to be paid therefor, based upon such higher value," would be understood by any business man accepting such receipt to mean that, by doing so and failing to declare that the value was greater, he agreed that the sum stated was the limit of such value. Clearly the carrier had a right to assume that the shipper accepted the contract with this understanding. At least by implication, this was a declaration of the value by the shipper accepted in good faith by the carrier, and the rate of freight was in accordance therewith; and this is emphasized by the fact that blanks were left to be filled in by the shipper showing the date of the shipment, the articles, the value, the name of the consignee, and the destination, all of which blanks were filled in by the shipper, except that showing the value. This, to our minds, shows clearly the intention of the shipper to accept the terms of the contract as contained in the stipulation referred to as the limitation of the value, with full knowledge that the freight charged was to be fixed partly in accordance with the value.

[3] The shipper was required to take notice of the published rates filed with and approved by the Interstate Commerce Commission, and which the carrier was required to charge. Adams Express Co. v. Croninger, supra.

The stipulation in the receipt given by the express company in the case above cited was as follows: "In consideration of the rate charged for carrying said property, which is regulated by the value thereof, and is based upon a valuation of not exceeding $50, unless a greater value is declared, the shipper agrees that the value of said property is not more than $50, unless a greater value is stated herein, and that the company shall not be liable, in any event, for more than the value so stated, nor for more than $50 if no value is stated herein." It is therein stated, as will be seen, that the shipper expressly agrees that the value of the property is not more than $50, unless a greater value is declared. We do not think that difference in the language affects the substantial identity of the receipt in that case and the one in this, so far as concerns the question here presented and the reasoning of the court applies equally to this case. The court says: "That no inquiry was made as to the actual value is not vital to the fairness of the agreement in this case. The receipt which was accepted showed that the charge made was based upon a valuation of $50, unless a greater value should be stated therein. The knowledge of the shipper that the rate was based upon the value is to be presumed from the terms of the bill of lading and the published schedule filed with the Commission." It is declared by the court, quoting from Hart v. Penn. R. R. Co., 112 U. S. 331, 5 Sup. Ct. 151, 28 L. Ed. 717, supra, that such contracts do not contravene any principle of public policy, but that, "on the contrary, it would be unjust and unreasonable, and would be repugnant to the soundest principles of fair dealing and of the freedom of contracting, and thus in conflict with public policy, if a shipper should be allowed to reap the benefit of the contract if there is no loss, and to repudiate it in case of loss."

The Croninger Case, being the latest expression of the Supreme Court of the United States on this question, must be considered as settling the law as to all cases coming within the purview of the decision, and must be followed whenever applicable, without regard to decisions of the Courts of Civil Appeals of this state, cited and relied upon by appellee. Pacific Ex. Co. v. Rudman, 145

S. W. 269; Head v. Pacific Ex. Co., 126 S. W. 682; St. L. Southwestern Ry. Co. v. Ray, 127 S. W. 281. The decision of the same court in Hart v. Penn. R. R. Co., 112 U. S. 331, 5 Sup. Ct. 151, 28 L. Ed. 717, supra, as applicable to the laws as now expressed in the Carmack amendment is fully approved. The case of Hohl v. Norddeutscher Lloyd, 175 Fed. 544, 99 C. C. A. 166, is also, we think, exactly in point.

Appellee's principal contention is that he is not bound by the act of the clerk who filled out the shipping receipt and delivered the goods to appellant's agent, upon his signing the receipt; and this seems to have been the ground of the trial court's conclusion that appellee was entitled to recover the full value, without regard to the stipulation referred to. We have endeavored to dispose of this contention in the first part of this opinion, and also of the further contention that this stipulation is not binding, because the clerk who filled out the receipt and delivered the goods did not know of this stipulation, nor of the fact that the rate was based partly upon the value. If we are right in our conclusions upon these two points, we think there can be no doubt whatever that this case must be ruled by the decision of the federal Supreme Court in the Croninger Case cited.

Our conclusion is that the stipulation in the shipping receipt referred to is valid, and is binding upon appellee. It follows that appellee was not entitled to recover the full value of the property, but that such recovery must be limited to $50. The judgment is therefore reformed, and judgment here rendered for appellee for $50, with interest at the rate of 6 per cent. per annum from May 1, 1909, with costs of the justice court. The costs of the county court are to be adjudged against appellee (article 1436, R. S.), as well as the costs of this appeal.